TATE, Judge
(dissenting).
With much respect for the excellently and conscientiously written majority opinion, I must nevertheless respectfully dissent from, this reversal of the trial court judgment which had held that the negligence of the defendants’ truckdriver contributed to the present accident. (For the question before us is not whether the accident was caused either by the negligence of the railroad of the engineer or by the negligence of the truckdriver: it is rather whether the latter’s negligence was a contributory cause of the accident.)
Factually, I would agree that, if the photographs D-3 to D-7 actually reflect the scene visible to the naked eye of the engineer as he approached the parked truck on the date of the accident in October of 1956, then indeed his own negligence in failing to perceive sooner the truck was the sole proximate cause of the accident. But what concerns me, and I think it raises a serious legal question as to the sufficiency of these photographs as proof of such, is that there is not one line of testimony to indicate that these photographs taken in April of 1958, one and one half years after the accident, correctly showed the view of the truck and the Consolidated warehouse visible to a railroad engineer approaching the site from the south on the date of the accident.
To the contrary, there is positive, sworn, and uncontradicted testimony by the only two engineers testifying that the truck-site at the side of the Consolidated warehouse was not visible to on-coming locomotives until they were within 200 feet of it, because of a shotgun house and an elm tree, in conjunction the shape of the “S-curve.” There is positive, uncontradicted, and sworn testimony by the Baton Rouge railroad terminal master and by one of the engineers that the shotgun house and the tree in question were removed after the accident and by the end of 1957, which was before the photographs were taken. (Tr. 255, 285. j[1] Moreover, the *808 uncontradicted evidence by engineer Thornton is that photograph D-3 did not reflect what could be seen as the warehouse was approached from the south. (Tr. 109.)
Further, the trainmaster testified that due to frequent complaints by the engineers that the limbs of the tree interfered with visibility, it was necessary to have these limbs cut “every so often”, “every four or five months”. (Tr. 254-255.) Thus, even conceding that a tree seen in the photographs is actually the one about which the engineers complained, there is no evidence to show whether the pictures in April 1958 represented it as recently trimmed, as compared with an untrimmed and view-obstructing condition at the date of the accident.
The able counsel for the defendants did not see fit to introduce any evidence to contradict such testimony. The photographs were introduced[2] by asking engineer Thornton, a witness for plaintiff, whether the photographs were of “the KCS track as it crosses Florida Street” (Tr. 69), which they obviously were by reason of the well-marked office buildings and other landmarks. There was not the slightest effort to obtain from Thornton or any other witness any testimony that these photographs resembled the scene on the date of the accident
It seems to me extremely doubtful, as a matter of law, that these unsworn and unauthenticated photographs should be given such weight as to override uncontradicted sworn testimony which specifically stated that on the date of the accident V}/¡ years earlier the visibility of on-coming locomotives was obstructed by a house and a tree which are no longer there and which were not there when the pictures were taken. As a trier of fact, I would have regarded the photographs with skepticism, because of the circumstances of their introduction and of the lack of proof that they reflected the scene as of the date of the accident; as an appellate reviewer, I am inclined to believe it is not within our function to substitute conclusions drawn by us from such unauthenticated photographs for the sworn testimony of witnesses accepted by the trier of fact.
Aside from the circumstances that a locomotive engineer approaching a heavily trav-elled thoroughfare in a heavily populated area might not reasonably be held to observe details perceivable in a still photograph available for inspection in the quiet of a law library, one last comment may not be inappropriate relevant to the reliability of these photographs as evidencing what might be seen by the naked eye of an engineer. Photograph D-3 was taken to show the scene from 6(Y south of Florida Street, or 540' south of where the truck was parked; in this photograph, the light station wagon is clearly visible, as are the details of the adjacent warehouse. But in photograph D-6, showing the scene from 100' south of Florida — or just 40 feet further south than the spot from which D-3 was taken — , the same light vehicle and the details of the warehouse are obscure and barely visible, and some shrubbery west of the track seriously interferes with visibility of the distant scene of the warehouse and truck. It is hard to believe that the 40 feet of distance made the great difference shown by the two pictures in the visibility of objects some 500' distant — without enlightening expert testimony or a more formal authentication of the pictures, for instance, one wonders whether or not the type of lens used was the same. While undoubtedly the camera could not see around a corner, it is obvious that the spots on this twisting “S” *809 curved track from which a picture is taken may reflect materially different obstruction of view of Consolidated’s warehouse by the shrubbery, trees, and buildings on the respective sides of the track.[3]
For these reasons I must respectfully disagree with the views of my esteemed brethren of the majority.

. The other engineer testified that the tree and house was removed, but he did not place a date as to said removal. Tr. 58. . Although he identified a tree on an aerial photograph taken in March, 1058 (D-2) as the elm tree in question, he also stated that the tree did not look like the one that blocked the view. Tr. 65-68. It is noteworthy also that he was not asked to identify the tree on the ground level view photographs showing the approach from the south. Although the *808 photographs do show a shotgun type house, there is not a word of testimony to indicate that this is the one that obstructed vision rather nearby one of the two such houses that were moved (Tr. 285) following the accident and before the trial.

. So far as my notes reflect, the sole evidence in this voluminous record concerning them is found: for photographs D-3 to D-6 at Tr. 69-72 and 108-112; for photographs D-l and D-2 from Tr. 64-69; and photograph D-7 was introduced and discussed at Tr. 111-112.

. It is of course unnecessary to add that no reflection is intended on the efforts of eminently honorable counsel, who did not introduce or vouch for the photographs as showing other than “the KCS tracks as it crosses Florida Street.” (Tr. 69.)